COMMONWEALTH of Pennsylvania, Appellee

v.

Richard GALLAGHER, Appellant.

Superior Court of Pennsylvania.

Argued Oct. 5, 2005.

Filed March 28, 2006.

Garrett A. Taylor, Erie, for appellant.

Paul A. Barkus, Assistant District Attorney, Butler, for Com., appellee.

BEFORE: HUDOCK, PANELLA and TAMILIA, JJ.

OPINION BY HUDOCK, J.:

¶ 1 This is an appeal from the judgment of sentence imposed upon Appellant after a jury convicted him of fleeing or attempting to elude police and possession of a controlled substance (marijuana).[1] He was sentenced to an aggregate term of thirteen to thirty-six months of imprisonment. This appeal followed. Both Appellant and the trial court have complied with Pa. R.A.P.1925. We affirm.

¶ 2 Appellant raises the following issue on appeal:

> WHETHER [APPELLANT'S] MOTION TO SUPPRESS EVIDENCE SHOULD HAVE BEEN GRANTED WHERE THE EVIDENCE IS UNCONTRADICTED THAT PENNSYLVANIA STATE POLICE DID NOT COMPLY WITH OHIO REVISED CODE §§ 2935.30 AND 2935.31 FOLLOWING THE EXTRA–TERRITORIAL ARREST OF APPELLANT IN THE STATE OF OHIO?

Appellant's Brief at 6.

¶ 3 Our standard of review is well settled:

> When reviewing an order denying a motion to suppress evidence, we must determine whether the evidence of record supports the factual findings of the trial court. In making this determination, this [C]ourt may only consider the Commonwealth's evidence and the defendant's evidence that remains uncontradicted. We view the Commonwealth's evidence, not as a layperson, but through the eyes of a trained police officer. We do not review the evidence piecemeal, but consider the totality of the circumstances in assessing whether probable cause existed. Additionally, it is exclusively within the province of the trial court to determine the credibility of the witnesses and the weight to be accorded their testimony. If the evidence

---

**1.** 75 Pa.C.S.A. § 3733(a) and 35 P.S. § 780–113(a)(16), respectively. Appellant was also found guilty of various summary offenses by the trial court.

supports the findings of the trial court, those findings bind us and we may reverse only if the suppression court drew erroneous legal conclusions from the evidence.

*Commonwealth v. Nobalez,* 805 A.2d 598, 600 (Pa.Super.2002) (citations omitted). As this Court has often reiterated: "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Elmobdy,* 823 A.2d 180, 183 (Pa.Super.2003) (citation omitted).

¶ 4 After retaining new counsel, Appellant was permitted to file an omnibus pretrial motion in which he sought to suppress evidence *nunc pro tunc,* and an evidentiary hearing was held on November 15, 2004. The Commonwealth presented the testimony of two Pennsylvania State Police officers, Corporal Robert J. Krol and Trooper Mark Temel, as well as the testimony of Deputy Mark Allen, a deputy sheriff with the Sheriff's Office for Ashtabula County, Ohio. Appellant did not present any evidence. The suppression court made the following factual findings based upon the testimony presented by the Commonwealth:

> On September 30, 2003[,] at approximately 1:40 in the morning, [Corporal] Robert Krol and [Trooper] Shawn Massey, were on routine patrol, in a marked state police vehicle, traveling east on Shadeland Road, Beaver Township, in Crawford County. Beaver Township is the northwestern most township in Crawford County, bordered on the west by the state of Ohio. At that time, Corporal Krol and Trooper Massey observed a Chevrolet S–10 pick-up truck, bearing Ohio registration plates which was parked at least halfway in the westbound lane of traffic, pointing in a westerly direction on Shadeland Road. The location of the truck was approximately one to one and a half miles east of Beaver Center Road. The officers decided to investigate. Corporal Krol approached the pick-up truck, observed that the vehicle was unoccupied and then noticed, upon shining his flashlight upon the bed of the vehicle, that there was a silver colored tarp covering the contents of the bed of the vehicle, with what appeared to be "several" marijuana plants sticking out from under the tarp and a "lot of leaves [sic]." [Corporal] Krol, having been trained to recognize marijuana, testified at the suppression hearing that he formed the opinion that the vegetable material he observed did appear to him to be marijuana, and moreover, he was impressed with the odor emanating from the vehicle that convinced him that there were marijuana plants beneath the tarp. He was so startled by this surprising discovery in a desolate part of Crawford County in the middle of the night that he was concerned for his own protection, fearing that he was a target who might be shot at from the wood line, so he quickly returned to his police cruiser to radio his discovery.
>
> After making the foregoing observations concerning the suspected marijuana, Corporal Krol transmitted the make, model, color and Ohio registration information concerning the vehicle to other patrol vehicles in the area. Among the [troopers] who received the dispatch were Troopers Mark Temel and Mike Fennell.
>
> The area in question is a rural area, which is sparsely populated. Krol and Massey decided to position their cruiser approximately three-tenths of a mile from the location of the pick-up truck and to commence surveillance. Approximately 12 minutes later, at or about 1:52 a.m., Corporal Krol observed a light

shining north across the road near the area of the vehicle, with the light coming from the south side. Shortly thereafter, Corporal Krol observed the brake lights on the pick-up truck coming on, with the back up lights then flashing. The vehicle then proceeded west on Shadeland Road. The officers decided to follow the vehicle; having concluded that probable cause existed to believe that the person operating the vehicle was in possession of recently harvested marijuana. The manufacture of marijuana is a felony offense. 35 P.S. 780–113(a)(30).

Troopers Temel and Fennell were in the vicinity of Beaver Center Road about the time that Krol and Massey began to follow the vehicle as it traveled west on Shadeland Road. Troopers Temel and Fennell gave chase, behind [Corporal] Krol and [Trooper] Massey as the pick-up truck was traveling west on Shadeland Road, going through the intersection of Shadeland Road and Beaver Center Road without having first stopped at the stop sign. While pursuing the vehicle, both patrol cars had their emergency lights operating and both observed that the suspect was operating the pick-up truck at a high rate of speed. As the pick-up truck was observed coming upon the intersection of Stateline Road, the vehicle then turned south onto Stateline Road. At this intersection, the pick-up truck slowed down briefly and a passenger, later identified as Jenny Maria Ferguson, got out of the vehicle. Corporal Krol stopped his cruiser at that location and Trooper Massey got out of the police cruiser and then apprehended Ms. Ferguson.

Meanwhile, the pick-up truck continued south on Stateline Road, then west on State Route 167 into Ohio, at which time Troopers Temel and Fennell were following [the pick-up], with Corporal Krol now following Temel and Fennell. Trooper Temel made a point of telling the dispatcher to keep Ashtabula County, Ohio law enforcement authorities aware of what was taking place from the moment he started his pursuit in the vicinity of Beaver Center Road and Shadeland Road. With Trooper Temel now the lead vehicle, and knowing that the [pick-up] was endeavoring to cross the state line, Trooper Temel made a point of keeping Ohio authorities informed of developments.

[The pick-up] continued south on Pennline Road, then west on U.S. Highway 6, approximately one-tenth of a mile after which [Appellant, an Ohio resident,] then jumped out of his moving [pick-up] truck and fled the scene while his truck then went into a ditch. All along the journey of slightly less than 11 miles, [Appellant] was traveling at an excessive rate of speed, going as high as 80 to 90 miles per hour on rural, sometimes gravel based roads, not showing the slightest inclination to voluntarily give up the chase.

At that point, [Appellant] was [apprehended and] placed into custody. Within two to three minutes, Deputy Sheriff Mark Allen of the Ashtabula County Sheriff's Department arrived, and he, too, took [Appellant] into custody[.] Deputy Allen is a canine handler for the Sheriff's Department. He had been in continuous radio contact with Trooper Temel and Corporal Krol throughout the episode, actually talking with them at various times during the evening and fully aware that [Appellant] was suspected of being in possession of a substantial quantity of marijuana plants and that he had led the Pennsylvania State Police on a high speed chase to avoid apprehension. As a canine handler, he was specially trained in the identification

of illegal drugs and testified that he personally observed a large amount of marijuana plants in [Appellant's pick-up] truck, for which [Appellant] was placed under arrest for violating Ohio's laws against drug trafficking and illegal possession.

[Appellant] was held in Trooper Temel's police cruiser, read his *Miranda* warnings and gave a statement that was heard by Deputy Allen. [Appellant] admitted that he had planted the marijuana in a cornfield in Crawford County and that he was harvesting the plants that evening out of a concern that the plants would be damaged from inclement weather. The affidavit of probable cause that was prepared and signed by Trooper Temel discloses that [Appellant] also intended to harvest plants belonging to some other individual as a means of retaliating against that individual who [Appellant] believed had stolen his motorcycle.

After giving his statement, [Appellant] was then transported to the Ashtabula County jail by Deputy Allen's [sergeant] because there was no room in Deputy Allen's canine vehicle. Before leaving the scene, Deputy Allen took photographs of [Appellant's pick-up] truck. [Appellant] was booked and brought before an Ohio Magistrate and arraigned later that morning on the charges that Deputy Allen intended to have brought against [him]. According to Deputy Allen [Appellant] was processed in accordance with Ohio law.

That same day (September 30, 2003), Trooper Temel obtained a search warrant for [Appellant's] truck and an arrest warrant so that he could have [Appellant] returned to Pennsylvania to face charges. The arrest warrant was faxed to the Ashtabula County Sheriff's Department. [Appellant] was brought before Judge Robert S. Wynn of the Ashtabula County Court where he waived extradition to Pennsylvania. The very next day (October 1, 2003) [Appellant] was transported from Ohio to Pennsylvania.

Trial Court Opinion, 11/16/04, at 1–4.

¶ 5 The suppression court's factual findings are amply supported by the record.[2] Thus, we must determine whether the court's legal conclusions from these findings were proper.

¶ 6 The trial court ruled as follows:

[Appellant] argues that [Pennsylvania precedent], read in conjunction with the [pertinent provisions of Ohio law], absolutely, and without exception, compel the Pennsylvania State Police who pursue a suspect into Ohio to take that suspect before a local magistrate without undue delay following arrest.

* * *

When looking at the facts in the case before this Court, [Appellant] was arrested not only by the Pennsylvania State Police Officers, but also by a Deputy Sheriff of the Ashtabula County Sheriff's Department. The two arrests occurred within two to three minutes of

---

**2.** As part of his challenge to the extra-territorial arrest, Appellant asserts that the trial court's finding that the Pennsylvania State Police had probable cause to believe he had committed a felony is not supported by the record. Upon review of the Commonwealth's testimony presented at the suppression hearing, in light of our standard of review, we conclude that the court's factual finding is supported by the record. *See Commonwealth v. Anderson,* 889 A.2d 596, 599 (Pa.Super.2005) (citation omitted) (explaining that, "[p]robable cause does not require certainty, but rather exists when criminality is one reasonable inferences, not necessarily even the most likely inference.")

each other. Section 2935.01 of the Ohio Revised Code includes [sheriff deputies] as peace officers, authorized to make arrests. Ohio Revised Code § 2395.01. Significantly, because of the coincident involvement of both Pennsylvania and Ohio authorities, [Appellant] was subject to arrest in the State of Ohio for violating Ohio's drug laws. Ashtabula County Sheriff officials participated in the interrogation of [Appellant] and, themselves, acquired evidence that would be available for use against [Appellant] in a prosecution within the State of Ohio. [Appellant] was booked and charged in accordance with Ohio law, even though it appears that the county prosecutor in Ohio later decided to defer to Pennsylvania where the marijuana was actually grown.

With two concurrent investigations taking place at the same time involving two police agencies, it was entirely appropriate for Pennsylvania State Police officials to defer to the Ashtabula County officials where [Appellant] was finally stopped, allowing those officials to take [Appellant] into custody and pursue the filing of charges against [him].

Trial Court Opinion, 11/16/04, at 5–6.

■ ¶ 7 Appellant argues that the suppression court's conclusions are in error because the Pennsylvania State Police officers failed to take him before a local magistrate in accordance with applicable Ohio law. Appellant further asserts that the uncontradicted evidence of record reveals that the Pennsylvania authorities arrested him first and, therefore, the failure to comply with applicable Ohio law, at that time, rendered the arrest unlawful. According to Appellant, "Pennsylvania law demands strict compliance with neighboring jurisdictions fresh pursuit laws, and it is clear that the Lower Court erred in concluding Pennsylvania State Police were not re-

quired to comply with Ohio statutory requirement after effectuating the arrest of Appellant in the state of Ohio." Appellant's Brief at 11. We cannot agree.

¶ 8 Ohio's Fresh Pursuit Law provide, in pertinent part, as follows:

§ 2935.30. Authority of foreign police

Any member of an organized state, county or municipal peace unit of another state of the United States who enters this state in fresh pursuit, and continues within this state in such fresh pursuit, of a person in order to arrest him on the ground that he is believed to have committed a felony in such other state has the same authority to arrest and hold such person in custody as has any member of any organized state, county, or municipal peace unit of this state to arrest and hold in custody a person on the ground that he is believed to have committed a felony in this state.

This section does not make unlawful any arrest in this state which would otherwise be lawful.

* * *

§ 2935.31. Hearing before magistrate in county of arrest

If an arrest is made in this state by an officer of another state under section 2935.30 of the Revised Code, he shall without unnecessary delay take the person arrested before a magistrate of the county in which the arrest was made, who shall conduct a hearing for the purpose of determining the lawfulness of the arrest. If the magistrate determines that the arrest was lawful he shall commit the person arrested to await for a reasonable time the issuance of an extradition warrant by the governor of this state, or admit him to bail for such purposes. If the magistrate determines

that the arrest was unlawful he shall discharge the person arrested.

Ohio Rev.Code Ann. §§ 2935.30 & 2935.31.

¶ 9 Pennsylvania appellate courts have dealt with similar laws from our sister states in two cases. In *Commonwealth v. Shaffer*, 710 A.2d 89 (Pa.Super.1998), a Pennsylvania State trooper observed a vehicle driven by Shaffer, a Pennsylvania resident, traveling at a high rate of speed in northeastern Pennsylvania and near the New York State border. The trooper began to follow Shaffer, ascertained that he was speeding, and then activated his police lights and siren in an effort to effectuate a vehicle stop. Shaffer did not stop immediately; rather, he drove for another two miles and did not stop until he was approximately seven-tenths of a mile inside the State of New York. The Pennsylvania trooper asked Shaffer to perform field sobriety tests. Shaffer failed these tests, was placed under arrest for drunk driving and was transported back to Pennsylvania.

¶ 10 Subsequently, Shaffer filed a suppression motion based upon a violation of the New York Uniform Act on Close Pursuit. This statute, similar to the Ohio legislation at issue in this case, granted authority to make an arrest in New York to a police officer of another state when that officer follows a person into New York in "close pursuit" for purposes of making an arrest. *Shaffer*, 710 A.2d at 90.[3] The statute further provided, however, that the officer making the arrest take the person arrested in New York before a local court "without unnecessary delay" so that the local court can "conduct a hearing for the sole purpose of determining if the arrest was in accordance with the provisions" of the statute. *Id.* at 91. At the suppression hearing, the Commonwealth conceded a

violation of the statute, but argued that the trial court should apply New York's case law, which provided a "good faith" exception, to uphold the validity of the arrest. The trial court declined to do so and granted Shaffer's suppression motion. The Commonwealth sought review of this ruling, and the matter was certified for appeal to this Court.

¶ 11 This Court first reasoned as follows:

In our opinion, the present case turns upon concepts of jurisdiction and sovereignty. There seems to be no question that Pennsylvania police officers are without inherent jurisdiction to make an arrest in New York State. Thus, the jurisdiction or authority of [the Pennsylvania trooper] to make an arrest in New York State, if any, is gained only through the grace of New York State. That grace, in this instance, is found in the New York version of the reciprocal or uniform Act on close pursuit. There also seems to be no dispute that the New York Close Pursuit Act was violated. Under the terms of the Act, an individual arrested in New York by an out-of-state-police [sic] officer after being closely pursued into New York must be taken before a local criminal court which shall conduct a hearing to determine if the arrest was in compliance with the Act. Since [the Pennsylvania trooper] did not take [Shaffer] in front of a local criminal court to determine if the arrest complied with the Act, the arrest violated New York's Close Pursuit Act and was therefore unlawful. The more significant question is what is the appropriate remedy for [Shaffer's] "unlawful" arrest.

---

**3.** Unlike the Ohio statute cited above, the New York statute permitted fresh pursuit into New York and an arrest for any crime committed in "another state which is a crime under the laws of the state of New York." *Shaffer*, 710 A.2d at 90.

*Shaffer*, 710 A.2d at 91 (citations and footnotes omitted). This Court then rejected the Commonwealth's argument that New York law should provide the remedy:

> Since the Commonwealth is putting forth this argument it is not surprising that New York courts have at least twice refused to suppress evidence where close pursuit statutes were seemingly violated. We cannot agree. Although it is quite proper to defer to New York law to determine whether or not the New York Statute [sic] had been complied with, there is no reason to refer or defer to New York law to determine policy matters relating to proper remedy for an unlawful arrest of a Pennsylvania resident by a Pennsylvania police officer for crimes committed in Pennsylvania. It is really a matter of sovereignty. Pennsylvania courts and Pennsylvania law must govern the rights of a Pennsylvania resident arrested by Pennsylvania police officers for crimes committed in Pennsylvania, even if the arrest is effectuated in New York State, not New York courts or New York law.... As a matter of accountability, sovereignty and simplicity, it is for Pennsylvania to dictate how its police officers are to carry out their duties and the consequences for violating such dictates. The remedy for an illegal arrest in Pennsylvania is suppression of the fruits of the illegal arrest.

*Id.* (footnotes omitted).[4] Thus, this Court, in *Shaffer*, affirmed the trial court's order suppressing the evidence seized as a result of Shaffer's unlawful arrest.

¶ 12 In *Commonwealth v. Sadvari*, 561 Pa. 588, 752 A.2d 393 (2000), two Pennsylvania State troopers, while on patrol near the Pennsylvania–Delaware border, observed a vehicle driven by Sadvari, a Delaware resident, approach from behind at a high rate of speed, abruptly decelerate as it reached the rear of the police car, and then proceed past it. The troopers began following the vehicle and established that it was speeding. Shortly after crossing into Delaware, the troopers activated their emergency lights and stopped Sadvari approximately four-tenths of a mile inside the State of Delaware. Subsequently, Sadvari was asked to perform field sobriety tests, which he failed. He was then arrested for drunk driving and was transported to a Pennsylvania hospital where blood samples were drawn for chemical testing. Sadvari was then taken to the State Police barracks near Media, Pennsylvania, and was ultimately released.

¶ 13 Prior to trial, Sadvari moved to suppress evidence related to the traffic stop as the product of an unlawful arrest. According to Sadvari, his arrest was unlawful because it was not conducted in accordance with Delaware's Fresh Pursuit statute.[5] The suppression court found that

---

4. This Court expressly limited its decision to the circumstances of an "extraterritorial arrest of a Pennsylvania resident by a Pennsylvania police officer for offense occurring in Pennsylvania. A change in any of these circumstances could quite possibly affect the analysis contained herein as interests of comity between states and state sovereignty may compel different conclusions." *Id.* at 92 n. 4.

5. The Delaware Fresh Pursuit statute provides that any member of a "peace unit of another state of the United States who enters this State in fresh pursuit, and continues

within this State in such fresh pursuit, of the person in order to arrest the person on the ground that the person is believed to have committed a felony, a misdemeanor or a violation of the motor vehicle code in such other state, shall have the same authority to arrest[.]" *Sadvari*, 752 A.2d at 395 (citing Del. Code, tit. 11, § 1932). The statute further provides that "[i]f an arrest is made in this State by an officer of another state in accordance with § 1932 of this title, the officer shall without necessary delay take the person arrested before a justice of the peace of the

the troopers had probable cause to stop Sadvari and that the Delaware Statute granted them authority to enter Delaware while in fresh pursuit and conduct an arrest. While the court agreed that, under the relevant provisions of the Delaware statute, Sadvari should have been taken before a Delaware justice of the peace, it viewed this requirement as an extradition provision. Thus, the court denied Sadvari's suppression motion, concluding that "the violation of Delaware law did not affect either the reliability of the evidence seized or Sadvari's constitutional rights." *Sadvari*, 752 A.2d at 396. This Court affirmed, after agreeing with the suppression court, that the applicable provision was an extradition statute to which the exclusionary rule did not apply, and our Supreme Court granted allowance of appeal.

¶ 14 In his appeal before the Pennsylvania Supreme Court, Sadvari argued that, in construing the relevant Delaware statute as an extradition provision, this Court ignored the statute's focus on the initial arrest and the requirement that a Delaware justice of the peace determine its lawfulness. Thus, he asserted that, because a Delaware tribunal was not provided the opportunity to pass upon the propriety of the troopers' entry and actions in Delaware, the motor vehicle stop was unlawful, thereby tainting all of the evidence that flowed from it. Sadvari also asserted that this Court's decision in his case conflicted with the decision in *Shaffer, supra.*

¶ 15 Our Supreme Court first discussed this Court's decision in *Shaffer* and concluded that we erred in distinguishing the statute at issue from that presented in *Shaffer*. The high court then concluded:

> As noted, the troopers in this case did not comply with the condition imposed upon their authority under the Delaware statute, which required them to bring Sadvari before a Delaware justice of the peace. Accordingly, under the rationale of *Shaffer*, which we endorse, the arrest was illegal.

*Sadvari*, 752 A.2d at 398. The high court then considered the correct remedy and concluded that suppression of evidence was warranted:

> In this instance, application of the exclusionary rule will serve primarily as a demonstration of comity to vindicate Delaware's sovereignty in light of Pennsylvania's incursion upon this important state interest. Suppression is also appropriate to encourage future compliance with Delaware's procedures and, in a more general sense, to safeguard the individual right to be free of unlawful seizures.

*Id.* at 399 (footnote omitted).[6]

¶ 16 Appellant argues that our Supreme Court's decision in *Sadvari*, as well as our decision in *Shaffer*, controls the disposition of the present case. However, neither of these cases involved an extraterritorial arrest before which law enforcement officials were notified of the police chase into their

county in which the arrest was made, who shall conduct a hearing for the purpose of determining the lawfulness of the arrest." *Id.* (citing Del.Code., tit. 11, § 1933).

6. In a footnote, our Supreme Court noted that this Court's decision in *Shaffer* "suggested that" it "turned upon the status of the arrestee as a Pennsylvania citizen." *Sadvari*, 752 A.2d at 399 n. 9. The high court noted, however, that when an extraterritorial arrest is

made, "the law of the state where the arrest occurred determines its validity." *Id.* (citation omitted). The Court then noted that, "[i]n any event, if anything, the sovereignty concern upon which our decision and *Shaffer* rest is heightened where, as here, the arrestee is a citizen of the state in which the extraterritorial arrest occurs." *Id.* As noted above, Appellant is an Ohio resident.

state and in which the officers of our sister state took the defendant into custody and processed him according to that state's law. As the Honorable John F. Spataro cogently recognized:

> It would be an irony of no small proportions to say that the holdings in *Sadvari* and *Shaffer[,]* which placed so much emphasis upon the need to recognize the sovereignty of a sister state, must now be interpreted to mean that Pennsylvania police officers must deny the transfer of custody of criminal defendants to the arresting police agency in the very locale where a crime is committed on that state's soil.
>
> Implicit in the holdings in both *Sadvari* and *Shaffer* is the concern that an arrested suspect receives the due process to which they are entitled in the state where they have been arrested. Those concerns were fully satisfied in the case now before this court.

Trial Court Opinion, 11/16/04, at 6. We further agree with Judge Spataro that, because he was not returned to Pennsylvania following his arrest, Appellant was afforded the opportunity to challenge the validity of his arrest by the Pennsylvania police officers when he appeared before an Ohio county judge for extradition. Thus, given the facts before him, Judge Spataro properly denied Appellant's suppression motion.

¶ 17 Judgment of sentence affirmed.